# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SHAWN RILEY,

                         Plaintiff,                           Case No. 17-CV-891-JPS

v.

JARED FRANKE, THOMAS
CAMPBELL, MARILYN
VANDERKINTER, and BRENDA                                    **ORDER**
KARNZ,

                         Defendants.

---

Plaintiff Shawn Riley ("Riley"), a prisoner, brings this action pursuant to 42 U.S.C. § 1983 against several prison officials at Green Bay Correctional Institution ("GBCI"). Riley claims that correctional officer Jared Franke ("Franke") purposefully smashed his hand in the food port of his cell while passing out meals, in violation of the Eighth Amendment's ban on excessive force. Next, he claims that another correctional officer, Lieutenant Thomas Campbell ("Campbell"), retaliated against him for complaining about Franke's use of force, in violation of the First Amendment, by imposing a back-of-cell restriction on him. Finally, Riley contends that two prison nurses, Brenda Karnz ("Karnz") and Marilyn Vanderkinter ("Vanderkinter"), violated the Eighth Amendment when they were deliberately indifferent to his medical needs arising from the injury to his hand.[1]

---

[1]In his complaint, Riley offered a host of other claims as well, but the Court did not permit them to proceed past screening. *See* (Docket #14 at 7–15).

On May 1, 2018, Defendants filed a motion for summary judgment as to all of these claims. (Docket #30). That motion is fully briefed and, for the reasons stated below, it will be granted in part and denied in part.

1.    **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

2.    **RELEVANT FACTS**

The facts material to the disposition of Defendants' motion, presented in the light most favorable to Riley, are as follows.[2] At all times relevant, Riley was a Wisconsin prisoner housed at GBCI.

---

[2]After the close of briefing, Riley moved motion to strike Defendants' reply materials. (Docket #57). Riley submitted two sets of responses to Defendants' motion, but Defendants replied only to the first. *See* (Docket #53, #54, #55). Riley believes that his second set operated as an amendment to the first and that, as a result, Defendants should have responded to the second. (Docket #57 at 2). He views their failure to do as admitting all of his factual assertions therein. Civ. L. R. 56(b)(4).

Riley and a fellow inmate, Anthony Janzen ("Janzen"), participated in the Islamic fast of Ramadan during August 2011. On August 5, 2011, Franke was passing out Ramadan meals and milk cartons in the segregation unit in the 200 wing of GBCI, where Riley and Janzen were housed. The cell doors in that wing have small food ports that open and close using a key.

In the segregation unit of the 200 wing, inmates are known to throw feces and urine on the hallway floors. Meals are normally kept on trays from preparation to service for sanitary purposes. The Ramadan meals were not on trays but instead kept in brown paper bags.

Franke approached Janzen's cell, two doors down from Riley. In order to open the keyed food port, Franke placed the bag containing the Janzen's Ramadan meal and his milk cartons on the floor of the hallway. Riley and other Muslim inmates in the area expressed their displeasure at having their meals placed on the dirty floor. Next, Riley heard Janzen inform Franke that his milks were warm and heard Janzen request new, cold milks. Riley heard Franke snap in an aggressive manner, "No! They're cold!" He then heard Janzen's food port slam shut. Riley also

---

Riley is incorrect. He is not allowed to amend a brief, a response to statement of facts, or his own statement of additional facts without the Court's leave once such materials have been filed. Amendment as a matter of course is only permitted for pleadings, like the complaint or the answer. *See* Fed. R. Civ. P. 15. Even if both sets of Riley's submissions complied with the Court's response deadline, the first set controlled absent a request for leave to amend, which Riley did not make. In any event, Riley's two sets of materials are not meaningfully different, so the parties' factual disputes surrounding the first set are sufficient to support the Court's findings herein. *Compare* (Docket #49), *with* (Docket #55). Thus, even if Defendants had committed a technical error, it would be forgiven in the interest of proceeding to decide the case on its merits.

heard Janzen's milk fall to the floor and heard Janzen say "Hey man, what's wrong with you," to which Franke did not to respond.

Franke then moved to Riley's door with his eyes fixed downward on Riley's food port. As he did with Janzen, Franke dropped both the bag and milks on the floor in front of the cell so that he could key open the food port. Riley immediately protested, asking him, "Why do you have my food on the dirty floor?" to which Franke loudly responded, "I got nowhere to put it with one hand, it goes on the floor!" He continued to stare at Riley's food port as he opened it.

Franke then picked up the bag from the floor and placed it on the lowered door of the food port. Riley retrieved it with his right hand and held it down to his right side, while Franke grabbed the two milks from the floor, setting them side by side on the lowered door. Franke then immediately put his right knee underneath the trap door in anticipation of closing it and locking it. Riley picked the milks up with his left hand, and with his hand still through the trap he informed Franke that the milks were warm and respectfully requested, in a calm manner, if he could have them switched for cold ones.

Franke, continuing in his loud and aggressive manner, responded "No they're not. They're cold!" Riley attempted to explain to Franke that the regular correctional officers allowed warm milks to be exchanged for colder ones, but Riley was abruptly interrupted by Franke jabbing twice and knocking both milks from his hands, sending them to the floor inside the cell. Franke angrily repeated that the milks were cold.

Next, Franke violently attempted to close the food port by slamming the door upward with his knee. But Riley's left hand was still in the way, as he was staring in disbelief at the fact that Franke had just

knocked the milks from his hand. Riley's hand was smashed and the door fell open again. Franke maintains that he thought all of Riley's food was inside the cell and that he could safely close the port. He contends that he did not know that Riley's hand remained in the port opening. Riley disagrees, saying that Franke saw his hand in the port opening and maliciously sought to hurt him because of his complaints about the food and milk.[3]

Riley immediately responded by yelling out "Ow! You just slammed my hand in the trap motherfucker." He removed his injured hand and with tears in his eyes stated to Franke, "I'm writing your ass up." For the first time since coming to Riley's cell, Franke looked up at him and said "You ain't gonna do shit!" as he simultaneously lunged and flexed his arms at his sides as if to invite a physical confrontation. Riley responded, "Alright, I'm writing your ass up motherfucker, watch!" as he pressed the emergency call button inside his cell. Franke, still smiling, again lunged provocatively towards Riley and said "You ain't gonna do shit!" before he abruptly left the segregation unit.[4]

Moments later, an officer responded to Riley's emergency call. Riley explained how Franke punched the milks from his hand and then

---

[3]Given the size and orientation of the food ports, *see* (Docket #36-1), it is not clear whether Riley would have been able to observe where Franke was looking or what he was doing during their encounter. However, Defendants did not always dispute such matters, *see* (Docket #55 ¶ 11), and even where they did claim that Riley could not see what was going on outside the cell, *id.* ¶ 15, the Court must disagree; mindful of its obligation to draw reasonable factual inferences in Riley's favor, the Court finds for present purposes that Franke was looking at the port during this time as Riley claims.

[4]Several fellow inmates, including Janzen, broadly corroborate Riley's assessment of Franke's demeanor and his actions during the August 5, 2011 encounter. *See* (Docket #47-1 at 38–46).

crushed his hand with the food port door. Riley requested medical attention and asked to speak with supervisory correctional officers right away. Franke eventually wrote Riley a conduct report for being disrespectful and making threats against him.

When an inmate causes problems relating to his food port, he is often issued a back-of-cell restriction. The restriction requires the inmate to kneel at the back of the cell and face away from the door during meal delivery. The restriction helps keep officers safe while they pass items through the food port. On the same day as the incident between Riley and Franke, Campbell was alerted by staff that there was an issue with Riley while he was being served his food through his food port. Campbell does not recall who alerted him to the incident or what was specifically said. Based on the type of behavior reported to Campbell, he placed Riley on a back-of-cell restriction for thirty days. Campbell says that at the time he issued the restriction, he did not know that Riley had said he planned to complain about Franke's conduct.

About forty minutes after the August 5 incident, Karnz saw Riley for an assessment of his hand injury. She noted that there was alteration in comfort from slight swelling and redness to Riley's left second and third fingers. No deformities were noted and the capillary refill was less than three seconds, indicating that his circulation was normal. During this visit, Karnz also noted that Riley was able to bend his fingers as he was sitting down, although he had reported to her that he could not move or bend his fingers. Riley responds that he was only slightly able to bend his fingers. Karnz ordered ice and ibuprofen and scheduled a follow-up visit the following Monday. Riley was advised to contact the health services unit staff if his symptoms worsened.

Riley told Karnz that an MRI was warranted to assess the damage to his hand. Ordering an MRI is not within Karnz's scope of practice. Riley believes, however, that she should have relayed his desire for an MRI to a prison physician. Karnz did not see Riley again regarding his alleged hand injuries.

Riley was seen by other prison medical staff in the ensuing days and received an x-ray on August 18. The x-ray report stated that there was no evidence of acute fracture or dislocation in his hand. The x-ray showed no abnormalities or signs of broken bone.

Vanderkinter saw Riley on September 1, 2011, for a follow-up appointment. She noted that his left hand appeared normal. There was no break in the skin, no discoloration, and no swelling or lump. Her report indicates that Riley had full range of motion in his fingers. He disputes the accuracy of the report, stating that she aggressively forced his swollen fingers to bend as far as she could make them and jerked the injured fingers around. Ultimately, Vanderkinter told Riley that she detected no problems with his left hand. Hearing her assessment, Riley became upset, exclaiming, "wait, two days ago there was a lump!" Vanderkinter said that he became loud and disrespectful to her and that he was escorted away by security staff.

Riley was transferred to the Wisconsin Secure Program Facility ("WSPF") on September 20, 2011. Once there, he was evaluated by Dr. Burton Cox ("Cox") for complaints of a hand injury. Cox found that Riley probably suffered a contusion in several fingers of his left hand and prescribed stretches, physical therapy, a hand splint, and pain medication. Later, a nerve conduction test returned normal results.

**3.     ANALYSIS**

Defendants raise several grounds for summary disposition of Riley's claims. First, they contend that Riley has failed to exhaust prison administrative remedies as to the First Amendment retaliation claim and the Eighth Amendment deliberate indifference claim. Second, Defendants argue that all three of Riley's claims fail on their merits, and that qualified immunity shields them from liability as to each claim. The Court finds that Defendants prevail on the exhaustion issue, and so it will dispose of the retaliation and deliberate indifference claims on that basis. However, the remaining Eighth Amendment excessive force claim must go to the jury, as genuine disputes of material fact preclude a finding in Defendants' favor and dismissal based on qualified immunity is not appropriate at this juncture.

**3.1     Exhaustion of Prison Administrative Remedies**

The Prison Litigation Reform Act ("PLRA") establishes that, prior to filing a lawsuit complaining about prison conditions, a prisoner must exhaust "such administrative remedies as are available[.]" 42 U.S.C. § 1997e(a). To do so, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require," and he must do so precisely in accordance with those rules; substantial compliance does not satisfy the PLRA. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *Burrell v. Powers*, 431 F.3d 282, 284–85 (7th Cir. 2005). A suit must be dismissed if it was filed before exhaustion was complete, even if exhaustion is achieved before judgment is entered. *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999). Several important policy goals animate the exhaustion requirement, including restricting frivolous claims, giving prison officials the opportunity to address situations

internally, giving the parties the opportunity to develop the factual record, and reducing the scope of litigation. *Smith v. Zachary*, 255 F.3d 446, 450–51 (7th Cir. 2001). Failure to exhaust administrative remedies is an affirmative defense to be proven by Defendants. *Westefer v. Snyder*, 422 F.3d 570, 577 (7th Cir. 2005).

The Wisconsin Department of Corrections maintains an Inmate Complaint Review System ("ICRS") to provide a forum for administrative complaints. Wis. Admin. Code § DOC 310.04. There are several steps an inmate must take to exhaust their administrative remedies under the ICRS. *Id.* § DOC 310.05. First, "[p]rior to filing a formal complaint, an inmate shall attempt to resolve the issue by following the designated process specific to the subject of the complaint. The [Institution Complaint Examiner ("ICE")] may request inmates to provide evidence of having followed the specified process." *Id.* § DOC 310.07(1). Next, the inmate must file a grievance with the ICE within fourteen days of the events giving rise to the complaint. *Id.* § DOC 310.07(2). The ICE may accept a late complaint "for good cause." *Id.*

The ICE may accept or reject a complaint or can return the complaint to the inmate with instructions to first attempt to resolve the issue informally as directed in Section 310.07(1). *Id.* § DOC 310.10. If the complaint is rejected, the inmate may appeal the rejection to the appropriate reviewing authority. *Id.* § DOC 310.11.[5] If the complaint is not rejected, the ICE issues a recommendation for disposing of the complaint,

---

[5]The ICRS defines a "reviewing authority" as "a person who is authorized to review and decide an inmate complaint," Wis. Admin. Code § DOC 310.03(15), which is usually the warden or his designee.

either dismissal or affirmance, to the reviewing authority. *Id.* The reviewing authority may accept or reject the recommendation. *Id.*

Next, if the ICE recommends dismissal and the reviewing authority accepts it, the inmate may appeal the decision to the Corrections Complaint Examiner ("CCE"). *Id.* § DOC 310.09. The CCE issues a recommendation to the Secretary of the Department of Corrections, who may accept or reject it. *Id.* § DOC 310.12. Upon receiving the Secretary's decision, or after ninety days from the date the Secretary received the recommendation, the inmate's administrative remedies are exhausted. *Id.* § DOC 310.13.

On September 2, 2011, Riley filed an inmate grievance complaining about the medical care he received from Vanderkinter (he did not mention Karnz). (Docket #35-3 at 2–3).[6] In the grievance, he mentioned that attempts to informally resolve his complaints with healthcare staff had been unsuccessful. *Id.* That grievance was returned to him by the ICE, Catherine Francois ("Francois"), with directions to contact the healthcare manager to again seek informal resolution of his complaint. *Id.* at 1. She notified him that if he received no response or was not satisfied with the response from the manager, he could refile the grievance. *Id.*

Defendants say that Riley never refiled the grievance, while he contends that he did try submit a renewed grievance to GBCI by mail from WSPF, to which he had been transferred on September 20. (Docket #54 ¶ 52); *see also* (Docket #49 ¶ 33–35). He did not submit to the Court a copy of the purported refiled grievance. Moreover, in his verified

---

[6]Riley also filed a grievance against Franke regarding the August 5 incident. (Docket #35-2 at 10–11). His exhaustion of prison administrative remedies as to the excessive force claim has not been challenged.

complaint, Riley contradictorily concedes that he was "dissuaded from resubmitting this specific complaint" because he anticipated that Francois would reject it as untimely out of animus against him. (Docket #1 ¶ 56).

Riley did not file a grievance relating to Campbell's decision to issue him a back-of-cell restriction. Riley asserts he did, but the grievance he provided to the Court only pertains to Campbell's alleged failure to photograph his hand injury. (Docket #47-1 at 8). It says nothing at all about the restriction. As a result, this grievance did not alert prison officials to the wrong for which Riley now seeks redress. *Strong v. David*, 297 F.3d 646, 649 (7th Cir. 2002). Riley counters that he filed a grievance about the restriction at the same time as this photography-related grievance, but again he has not provided a copy to the Court. (Docket #54 ¶ 49); *see also* (Docket #49 ¶ 26); (Docket #49-1 at 45–46).

Given the Court's role as the factfinder on matters of exhaustion, *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008), it is beyond belief that Riley, who has kept meticulous records of his correspondence with prison officials, did not keep a copy of the back-of-cell grievance he allegedly submitted or the medical-care grievance he allegedly resubmitted after complying with Francois' instructions. His uncorroborated averments toward that end are not enough to raise a genuine question in the Court's mind. *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999) (summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events"). Consequently, the Court need not convene an evidentiary hearing to determine the matter against Riley. *See Pavey*, 544 F.3d at 742.

Moreover, Riley admits that both grievances—assuming for the moment that he did, in fact, submit one about the back-of-cell restriction—were returned to him by Francois with directions to attempt informal resolution first before pursuing a grievance. *See* (Docket #54 ¶¶ 49–50). He contends that because he tried this before submitting the medical care grievance and told Francois about this in the grievance itself, *see* (Docket #47-1 at 22–23), her direction to try unofficial resolution yet again was unreasonable. Similarly, he says that he attempted informal resolution of the back-of-cell restriction issue and tried to resubmit the grievance after he met with failure. *See* (Docket #54 ¶ 49). But the fact remains that he did not submit renewed grievances, and although the Court's review on summary judgment is deferential to Riley, he has not raised a genuine dispute as to whether those documents exist based solely on his averments. *Pavey*, 544 F.3d at 742.[7]

---

[7]Even accepting his claim that he mailed a renewed medical grievance to GBCI, Riley's submission of the renewed grievance by mail was probably not in compliance with the ICRS procedures. The administrative code provides that

> [i]f an inmate is transferred after an incident but before filing a complaint, the inmate shall file a complaint related to the incident at the currently assigned institution. The ICE shall refer the complaint to the ICE at the appropriate institution for investigation and reviewing authority decision. If the transfer is to a contracted facility, the inmate shall file the complaint with the institution where the issue arose.

Wis. Admin. Code § DOC 310.07(9). Thus, it appears that Riley should have filed his renewed grievance with the ICE at WSPF, who would have referred it to Francois at GBCI. Yet the next paragraph of this code provision states that "[i]nmates shall file complaints with the institution where the incident occurred," suggesting that submission by mail directly to GBCI was not inappropriate. *Id.* § DOC 310.07(10). Defendants do not argue that Riley's purported attempt at mailing the renewed complaint was itself out of compliance with the ICRS; they simply say that no such submission ever occurred. The matter can be resolved

Finally, Riley argues that any failure to pursue renewed grievances should be forgiven, as Francois, whom he believes is related to one of the supervisory correctional officers involved in investigating the incident, actively tried to stymie his exhaustion efforts by sending back his grievances for pointless efforts at informal resolution and then rejecting renewed grievances as untimely. *See* (Docket #1 ¶ 43). There is no futility exception to the exhaustion requirement, nor is a good-faith effort sufficient. *Perez*, 182 F.3d at 537; *Smith*, 225 F.3d at 452. Whatever Riley thought of Francois' motivations or the reasonableness of her treatment of his grievances, he was obligated to timely resubmit grievances in accordance with ICRS procedures. He was given an opportunity to resubmit those grievances regardless of the outcome of the informal resolution process. *See* (Docket #35-3 at 1). And if he thought they would be rejected as untimely, he could have sought an extension of the submission deadline for good cause, as permitted by ICRS regulations. He has offered no minimally competent evidence that he did so with respect to his deliberate indifference and retaliation claims, and so they must be dismissed without prejudice for his failure to exhaust prison administrative remedies. *Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir. 2004).

### 3.2 Excessive Force and Qualified Immunity

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" on prisoners. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). When a prison official is accused of using excessive force, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause

---

without addressing this apparent contradiction in the administrative code, so the Court saves this issue for another day.

harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010). Several factors can inform this determination, including the need for force, the amount applied, the threat the officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury caused to the prisoner. *Hudson*, 503 U.S. at 7; *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004).

The Supreme Court has instructed that the question is not whether the force employed, viewed with the benefit of hindsight, was appropriate, but whether it was motivated by "obduracy and wantonness." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). As a result, on summary judgment "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." *Id.* at 322.

The Seventh Circuit has, on several occasions, addressed claims of excessive force where a correctional officer closes a cell trap door on an inmate, causing him injury. Those precedents demonstrate that summary judgment is inappropriate in this case. In *Sallie v. Thiel*, 23 F. App'x 586, 587 (7th Cir. 2001), the inmate stuck his arm through his cell trap door and refused to retract it back into his cell. Correctional officers sprayed him with pepper spray and then one of them pushed on the trap door, severing the tip of the inmate's finger in the process. *Id.*

The Court of Appeals overturned a grant of summary judgment to the officers, finding that a reasonable jury could conclude that the officer

who pushed the door shut did so maliciously. *Id.* at 589. The court observed that, while "valid security reasons exist for keeping the feed slot doors in the segregation unit of a prison closed whenever possible," there appeared to be no urgent need to close the door at the time of the incident. *Id.* More importantly, the Seventh Circuit found that

> [the officer's] awareness and intent when he shut the feed slot door is a material question of fact. If [the officer] closed the feed slot door knowing that [the inmate's] finger was caught in the hinges and intending to injure him, then [the officer] "maliciously and sadistically" caused [the inmate] harm. Because of the difficulty of proving a subjective state of mind, cases involving motivation and intent are often inappropriate for summary judgment. *See Alexander v. Wis. Dep't of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001). The record offers conflicting evidence concerning [the officer's] awareness and intent. The district court credited [the officer's] account of events over [the inmate's] and concluded that [the officer] had severed [the inmate's] finger accidentally. At the summary judgment stage, however, the record should have been reviewed in the light most favorable to [the inmate], and all inferences should have been drawn in his favor. *Frost*, 241 F.3d at 867–68. [The inmate] claimed that he cried out before [the officer] completely shut the door and severed his finger. In addition, in his response to interrogatories, [the officer] stated that he heard [the inmate] cry out while he was closing the door. [The inmate] also filed two affidavits from fellow prisoners who stated that [he] had cried out while [the officer] was closing the door. One could therefore infer that [the officer] knew that [the inmate's] finger was caught in the door and that he intentionally and maliciously harmed [the inmate]. Summary judgment was therefore inappropriate.

*Id.*

The analysis here is indistinguishable from that in *Sallie*. First, although Franke claims that he did not know Riley's hand remained in the

food port opening, (Docket #31 at 5), Riley avers that he did because Franke's eyes were directed toward the opening and Riley's hand was clearly visible. In the present posture, the Court must credit Riley's account, which is corroborated by the testimony of fellow prisoners. *See supra* note 6.

Moreover, Riley's version of events suggests that Franke acted out of a desire to harm Riley for nagging him about his treatment of the food and milks. This would not be a permissible motivation for the application of force. *See Hill v. Shelander*, 992 F.2d 714, 717 (7th Cir. 1993) ("If the fact-finder were to accept [plaintiff's] story, then [defendant] arguably acted without justification because there would have been no need for [defendant] to physically assault [plaintiff] in order to maintain or restore discipline in the cell."). Even if Riley's injuries were ultimately not severe, a reasonable jury could infer that Franke acted maliciously with intent to injure him. *Hudson*, 503 U.S. at 4 (a prisoner need not suffer "serious injury" to bring an Eighth Amendment claim); *Hendrickson v. Cooper*, 589 F.3d 887, 891 (7th Cir. 2009) (officer applied "gratuitous" force, intended only to cause pain, when he had an argument with an inmate and then slammed the inmate into a wall without perceiving any real threat).

The Seventh Circuit's decision in *Outlaw* does not suggest a different result. There, the undisputed evidence showed that the officer slammed the inmate's hand in his cell trap door after the inmate extended his hand through the door while holding trash and exclaiming, "take this garbage, you bitch." *Outlaw*, 259 F.3d at 834–36. The inmate suffered only minor injuries. *Id.* The Seventh Circuit affirmed summary judgment in the officer's favor, finding that, because the inmate did not dispute that he had been insubordinate and threatening to the officer, there existed

sufficient justification for the use of force. *Id.* at 838–39. Moreover, the court compared the need for force to the inmate's relatively minor injuries and concluded that the force applied was not excessive. *Id.* at 839. Thus, said the Court of Appeals, the most that could be said is that the officer "deliberately and perhaps unnecessarily applied a relatively minor amount of force to achieve a legitimate security objective." *Id.*; *see also White v. Matti*, 58 F. App'x 636, 638 (7th Cir. 2002) (rejecting excessive force claim where it was undisputed that the inmate reached through his trap door in violation of prison rules and suffered only minor injuries).

Two important facts distinguish this case from *Outlaw*. First, Riley maintains that his injuries were much more severe than those apparently suffered by the prisoner in *Outlaw*. The parties' dispute about the severity of the injuries cannot be resolved conclusively at this juncture. Second, even if one accepted that Riley's injuries are minor, that factor usually only tips the scales when there is a close question about the justification for the force. *Hendrickson*, 589 F.3d at 891. Here, Riley has proffered adequate evidence which, if believed, establishes that Franke's use of force was unjustified. In contrast to *Outlaw*, where the plaintiff had admitted that he was insubordinate and threatening, here Riley's sworn statements indicate that he did nothing to provoke Franke to violence. At most, he objected to the mishandling of his food, something which, even if insubordinate, perhaps should not have required slamming his hand with the trap door. Because Riley's and Franke's accounts of the August 5, 2011 encounter differ in critical respects, the question of what really happened that day must be posed to the jury.

For similar reasons, the Court cannot at this juncture grant Franke's request for qualified immunity. That doctrine protects government

officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To defeat an assertion of qualified immunity, the plaintiff must first proffer facts which, if believed, amount to an actual violation of his constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Easterling v. Pollard*, 528 F. App'x 623, 656 (7th Cir. 2013). Next, the plaintiff must show that the violation of his constitutional rights was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling*, 528 F. App'x at 656 (citing *Pearson*, 555 U.S. at 232). A right is clearly established when its contours are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and alterations omitted). Courts should "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Supreme Court recently emphasized that courts must not "'define clearly established law at a high level of generality.'" *Id.* (quoting *al–Kidd*, 563 U.S. at 742). It would not do, for example, to deprive a correctional officer of immunity merely because the Eighth Amendment broadly proscribes "cruel and unusual punishment," or even more specifically, prohibits excessive force in the context of inmate discipline. *See id.* at 309 (faulting overbroad descriptions of Fourth Amendment rights such as "warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment"). The inquiry should be focused on particular conduct undertaken in particular situations. *Id.* That said, "general statements of the law are not inherently incapable of giving fair and clear warning" to officers, *United States v. Lanier*, 520 U.S. 259, 271 (1997), but "in the light of pre-existing law the unlawfulness must be apparent," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The Court finds Franke's present assertion of qualified immunity unavailing. Defendants argue that even if Riley was injured, it was not a clear violation of his constitutional rights for Franke to innocuously close Riley's food port without knowing his hand was inside the opening. This assertion is flawed on two levels. Initially, it wrongly assumes that the Court will accept Franke's version of the relevant events. The Court must construe the evidence in Riley's favor at this stage, and therefore must base its qualified immunity assessment on the facts as Riley presented them. *Mordi v. Ziegler*, 770 F.3d 1161, 1164 (7th Cir. 2014) ("The court cannot resolve disputed issues of fact when it addresses [whether a constitutional violation occurred] because the ordinary rules governing summary judgment apply in that situation."). As explained above, the

record, viewed in the light most favorable to Franke, could lead a reasonable jury to conclude that Franke intentionally used unconstitutionally excessive force during the August 5, 2011 encounter. Thus, Riley has developed evidence which, if believed, would amount to a violation of his constitutional rights.

Second, the Court finds that Riley's constitutional right was clearly established at the time of Franke's conduct. In keeping with the most recent authority from the Supreme Court, this Court will define the relevant constitutional right narrowly, tailoring it to the context of this case. *See Mullenix*, 136 S. Ct. at 308. Employing that approach, the question is whether any reasonable official would have known that slamming a food port door shut using his knee with an inmate's hand in the way, without provocation beyond complaints about the quality of the official's handling of food, violated the inmate's constitutional rights.

The Court answers that question in the affirmative, based upon the line of cases already consulted in evaluating the merits of the claim. First, *Sallie* explains that where an officer knowingly closes a food port door on an inmate's hand without a valid reason, causing injury, he will be liable for using unconstitutionally excessive force. *Sallie*, 23 F. App'x at 589. Second, even *Outlaw*, in which the Seventh Circuit ruled in the officer's favor, demonstrates what sort of factors need to be present to avoid liability—*e.g.*, a good reason to use force, such as threats or insubordination, and an amount of force tailored to those needs. *Outlaw*, 259 F.3d at 838–39. Given this controlling precedent, it was "beyond debate" at the time Franke acted that his conduct violated Riley's Eighth Amendment right to be free from cruel and unusual punishment. *Werner v. Wall*, 836 F.3d 751, 762 (7th Cir. 2016). While this precise circumstance

may not have arisen in a prior case, in the present posture the Court can place Franke's actions within the realm of obviously impermissible conduct, which is enough to overcome his assertion of immunity at this juncture. *White*, 137 S. Ct. at 552.

Resolving the disputed facts in Riley's favor, as the Court must do here, Franke is not entitled to summary judgment on Riley's Eighth Amendment claim or on his own qualified immunity defense. After the jury determines the facts in this case, qualified immunity may be revisited.

**4.      CONCLUSION**

For the reasons stated above, the Court finds that Riley has not exhausted his prison administrative remedies with respect to his First Amendment retaliation and Eighth Amendment medical deliberate indifference claims. Consequently, they must be dismissed. However, there remain genuine disputes of material fact concerning Riley's Eighth Amendment excessive force claim and Franke's qualified immunity defense as applied to that claim. Those matters must be addressed to a jury, and so the Court will issue a trial scheduling order along with this Order to schedule matters relating to the trial and apprise the parties of their trial preparation obligations.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #30) be and the same is hereby **GRANTED in part** and **DENIED in part**;

**IT IS FURTHER ORDERED** that Plaintiff's motion to strike Defendants' reply materials (Docket #57) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's claims of retaliation under the First Amendment and medical deliberate indifference under the Eighth Amendment be and the same are hereby **DISMISSED without prejudice** for failure to exhaust prison administrative remedies; and

**IT IS FURTHER ORDERED** that Defendants Thomas Campbell, Marilyn Vanderkinter, and Brenda Karnz be and the same are hereby **DISMISSED** from this action.

Dated at Milwaukee, Wisconsin, this 3rd day of August, 2018.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge